Thank you, Your Honor. Glenn Zwang for the defendant. All right. And appellant. Where to start? The court has had its fill this term of internet contract cases, having had two recent ones come up, Shabella and Godin, and before that, Berman and Kebaugh. The court's seen a lot of these. And this is what the court, I'm sure, understands from reading these opinions and probably dealing with these cases yourselves, is how factually intense. These are all factually intensive. It's all about seeing how these items were presented. And this case is about whether the agreement was reasonably conspicuous. Was it reasonably conspicuous? And there's lots of visual factors that go into that. The courts talk about, first and foremost, they always talk about font size. Is this fine print buried somewhere in location? Is it fine print that they're burying somewhere? Or is it plain as can be and right there, right next to the click box? Counsel, would you start with the standard of review? Because that would, would that not impact how we look at what you're asking us to look at? The standard of review is de novo. The court is in the same position as the trial court. So you have where's the font? What is the font? What does it look like? You have visuals. How cluttered, how congested is the page with advertisements of the product or services? Let me talk about this specific page. The create account is in all bold, all caps. The no sugar daddies or sugar babies is all bold, all caps. The service agreement and privacy link, not bolded, not all capitalized. It's underlined, but that's not quite clear that that's a hyperlink. And that's actually what Mr. Massell says in his declaration. How do you want to respond to that? I mean, clearly successful match could have all bolded and all capitalized service agreement and privacy policy, couldn't they, to make it more conspicuous? Yes, but perfection is not the standard, Your Honor. If you look at this page, what makes this page different than every other page that I've seen, it's different than Berman or, or, or Cibola or Godin. This is a stand-alone page. This is the only, the only purpose of this page is to create an account which has to be done in order, and you have to agree to these terms and this privacy policy in order to create an account. That's the first thing you would notice. So, and there's no hide the ball going on here. The, the advisal is clear and unambiguous and right there in front of the click box. And by the way, this is a click wrap agreement. It has a click box, which is unlike any of the cases that I've reviewed that are briefed in, in, before the court, because none of those courts are click wrap cases. Those case, click wrap cases are generally considered safe because you have an unambiguous, we agree, you know, agreement to the terms and you have an advisal that tells you this is, this is what you're agreeing to and you have in the click box, it says agree to the service agreement and, and privacy policy. So it's right there in the click box, which is giving information that this is a hyperlink. But that, that doesn't require the user to review those terms, does it? It does. If you look at the advisal, it says to become one of our members, you need to review and agree to the terms and conditions of both agreements and check the agree box below. If you disagree, you will not be given access to the site. So it's telling them you have to, you have to review it, you have to agree to it, and here they are. But you agree that under Oberstein, just underlining the service agreement and privacy policy alone wouldn't be enough, right? The district court was right on that. I'm sorry. In Oberstein, you had. Well, just the question of just underlining service agreement and privacy policy alone would not be sufficient, correct? It depends on the context. For example, it, in, in Godin, Judge Nelson cites a U.S. Supreme Court case, which is Reno versus ACLU, where the U.S. Supreme Court says hyperlinks are usually either in color or underlined. So it's not unreasonable to expect a reasonably prudent internet user to see an underlined term where there's only, only several, there's four, total of four underlined terms on this page and they're all links. Already a member? Sign in. That's clearly a link. But I'm looking at Oberstein, quote, the mere underlining of hyperlink terms and conditions was insufficient to alter a reasonably prudent user that a clickable link exists. That's, well, in Oberstein. That's a 2023 Ninth Circuit case, right? In Oberstein, the court, if memory serves, approved the reasonable conspicuousness of the link. So, so counsel, it's not just the underlining we look at. We look at the entire page.  To see whether or not, I, I think the point was that merely underlining, if everything else is obscure, doesn't get you there. That's right. But underlining with, with everything else being a reasonably conspicuous could get you there. Correct. You have to, in fact, I think Judge Nelson, again, just in the, in his Godun opinion said, you know, at bottom, this is a factual investigation of the totality of facts and the court has to consider what at the bottom of the, he says at bottom you have to consider what a reasonably prudent internet user would expect. And he says, and I quote, a healthy dose of common sense goes a long way. This is a, this is simply looking at the entire visual and, and virtually every case says you look at the entire visual and analyzes. Berman, Chipola, Godun, they all analyze the entire visual and they say, and they I, I think you've got a pretty good argument in support of your position, particularly if, if review is de novo, but help us to understand if we were looking at these cases on a continuum and you were asked to, to tell us what more could you have done, so we know how far you are on the continuum, would you concede that there's something more you could have done than what we're looking at? Clearly, or I wouldn't be here. Your honor. What is it that you could have done that would have prevented your being here? If, if, if, if, if a. Or your client could have done. Well, we could have had, had, had, obviously there was a lot of care and attention paid to this particular. Well, particularly for the sugar daddies and the sugar babies part that was bolded. Well, I'm looking at the, on the bottom that we have a sign in a privacy safeguard, but what could they have done? Well, about, since it's a click wrap and you've got an absolute clear and unambiguous agreement and you've got a very extensive advisal that's telling them they must review and agree or they can't use the site. You have bolded that the same way that you did. You could have. You could have made it bold. You could have made it different colors. You could have done a lot of things to draw more attention, but we're talking about drawing attention to the, to the fact that you have these two hyperlinks in the click box, right? It's, and I would argue, Your Honor, that there's a lot of attention that's drawn to it. First of all, you don't see any advertisements. You don't see any products advertised. You don't see any people exercising like you see in these other cases. You don't see the, the, the agreement in a corner somewhere. What you see, and obviously they paid a great deal of attention to the law in creating this, you see a single page, which you don't see anywhere else in any of these agreements, you see a single page dedicated to this purpose. And did the users have to click, have to click onto that to proceed further? Yes. You had to, you had to check the box that you agreed and then you had to check the continue box. Continuing without checking the box doesn't get you anywhere. You don't get into the website. But they didn't have to click the service agreement or privacy policy. They could have just agreed to both, right? Yes, but they agreed to review it. And let me ask you, this is a little bit difficult because we're just looking at sort of photocopies on briefs. But the vassal declaration says, I just didn't know that there was a hyperlink. I saw service agreement and privacy policy were underlined, but I just didn't see that it was a hyperlink. And just looking at it as a photocopy on a brief, it's hard to tell that that's a hyperlink. Does that make sense? It just looks like an underline. Well, you're seeing what looks like a photocopy on a brief that's a fraction of the size of what a screen would be. But you're saying the hyperlink was more obvious or more conspicuous if we saw it live or on a screen? This whole screen page on the paper page, if you expand that out to the entire page, you get what would be a small computer screen as opposed to a large computer screen. And you can tell that all of this would be very clear and very apparent. It's, you know, I don't know why it's not a little bit bigger, but it just isn't. But yes, there's I mean, other than that, other than, you know, putting some bells and whistles on the privacy policy and service agreement, which, by the way, you know, our U.S. Supreme Court says underlining is common. Well, for example, could you have deleted the no sugar daddies or sugar babies line? Because one way of looking at that is that it causes a user to divert attention, and it makes it appear that that's what we really care about. It's the only non, it's the only what you might call potential distraction on the page. And if you look at the, I would ask the court to look at the Kibaugh case where you had, it was, they were providing games, video games, and most of the screen are these wonderful animations, pictures of what the game has inside, most of it. And then on the bottom, it has the advisal, and it has not hyperlinks, not colored, but hyperlinks on the bottom, not colored. They're in boxes. Counselor, ER-4 shows the, a sample of the page, ER-4? ER-4? Excerpts of record page four? Yes. Is that a fair representation of how the screen looked? If you're looking, I don't have that in front of me. It's in the district court's order. Yeah. Yeah. So that's what the district court was looking at. The district court was looking at, yes. Yes. So I'm asking you, what the district court was looking at, is there, do you have the record with you? The only, I'm sorry, Your Honor, the only difference is. Do you have the record? I don't have it with me. It's not on a computer screen. And a computer screen is bigger than a page. It's a lot bigger than a page. And if I remember correctly, the court's, the size of the computer screen on the court's order was akin to what the size is on this brief. So it's not, you know, what could be done? You could, you know, Kibaugh had the terms and conditions and the privacy in a, on the without underlines and without colors. And the court said that's reasonably conspicuous. You would agree that that case says that just accessing a website doesn't create an ongoing relationship, right? Just accessing a website. The just, the just answer cases don't necessarily, they said, didn't create an ongoing relationship. This case clearly does. This is a dating service, an internet dating service, where you have to become a member. And people don't generally just date one person and say, I'm done, I'm falling in love and that's it. Dating services are by nature ongoing and a reasonably prudent internet user is going to expect. You would assert that this is more than just accessing a website, right? Yes. Okay. Your position is not that just, just accessing a website creates an ongoing relationship, right? Correct. Okay. This is an internet dating website as opposed to a one off sale of a product or a click here and you'll start your one week trial with automatic renewals if you don't cancel. You know, you're talking about something that is designed to be a long term, a longer term proposition where a reasonably prudent internet user is going to be expecting a   Counselor, you're almost out of time. I'm almost out of time. Whatever I have left, I will reserve for. All right. Thank you, Counselor. Thank you, Your Honor. Good morning, Your Honors. May it please the court. My name is Jerusalem Beligan on behalf of the respondent. What I wanted to focus my attention on first is reasonable conspicuousness and respond to the, the millionaire matches contention that there's no rule in our ninth circuit precedent that says that the hyperlink needs to be colored. But there is a rule that was created by Berman that says that simply underscoring words or phrases will be often insufficient to alert a reasonably prudent user that a clickable link exists. Often, but not always. We have to look at the entire page to see whether or not it's reasonably conspicuous. Let me ask you this. Did your client represent that they did not see the hyperlink at all? Yes, Your Honor. He did not know that was a hyperlink. Did he ever get into the website? He did get into the website. How did he get into the website if opposing counsel says you can't get into the website unless you click on the hyperlink? No, I click on the box. Which box? There's a box next to the, the, the hyperlink link. But clicking on that box is agreeing to the service agreement and the privacy policy, right? You can't get to the next page until you assent. Well, that's right. I mean, aren't you kind of stuck on this page if you don't agree to that service agreement and privacy policy? Well, no, Your Honor, because even if he clicks on that box, he still was not given conspicuous notice that the terms service agreement and privacy policy were hyperlinked. And also in the, the two cases that came after. Well, what, what law says that you have to have the user actually read the agreements? They can choose not to read it and go ahead and agree to it. Which it sounds like what Mr. Mosel did, right? Well, I, I think the cases that are on point that discusses that is Chabola and Godun, which were filed after our answering brief was filed. But in those cases, they said that the advisory notice or the explanatory paragraph must explicitly inform the user what that user is agreeing to. And in that case, in, in, for example, in Chabola, the court held that the explanatory or advisory paragraph was not, did not explicitly notify the plaintiff that by clicking on the continue button or, or redeem button that she would be agreeing to the terms of service. But it says to become one of our members, you need to review and agree to the terms and conditions of both agreements and check the agree box below. If you disagree, you will not be given access to the site. That advisory notice should have said by clicking continue button, I agree to the terms of service. No, that's not true. The continue button is separate from the agree to both the service agreement and the privacy policy button. You have to click both to get to the next page to access the website. I suspect you also have to click I'm not a robot. So you have to click three buttons before you can access the website. Yeah. The agree to the terms of the service agreement and privacy policy, you have to say you're not a robot and you have to continue. But the, the over the, just the design aspect of the, of the webpage doesn't give the, the user reasonable conspicuous notice of the privacy policy and the advisory paragraphs or explanatory paragraphs do not state that by clicking the continue button, I am agreeing to the service agreement. So therefore, there's no manifestation of consent, unambiguous manifestation of consent as set forth in, in Chabola and Godun. In those cases, the court held that the explanatory paragraphs did not explicitly inform the users that they were agreeing to the terms of service. But it says exactly that, that you are agreeing to the, you have to read and agree to the terms of service before you become a member. It says I, it says agree, but it does not say by clicking on the continue button, I agree to the service agreement. And in Godun, Your Honor, I just want to, you know, in Godun. You know, let me ask another question. The district court here, while it may be true, it wasn't in all capitalized, it, it wasn't bolded, but didn't look at overall screen design, continuing relationship, natural flow, didn't consider the context of the transaction that you have to assent before you can access the website, didn't analyze whether it was cluttered or not. This is a totality of the circumstances, very fact intensive inquiry. And how should we evaluate the lower court order that focused only on the underlying and the lack of bolding and capitalization and didn't take into account these other circumstances? How are we supposed to think about that? Well, I, I think in the beginning, um, when asked whether or not what the standard review is, it's de novo. And the court renew, you know, analyzes this anew. And I don't, even though the, the district court didn't analyze the context of the transaction, I think the contact, context, context of the transaction isn't, doesn't, it's more neutral than what, than helping one side or the other. But is it an error not to consider context of the transaction? You just conceded that the district court didn't consider it. Would that be sufficient reason to reverse here? I don't think so, Your Honor. Why not? You just said, and the case law says we have to consider totality of the circumstances, context of the transaction, all these other things. Because that was in Keyball. In Keyball, um, the, the district court actually took, uh, factored in the context of the transaction heavily without even looking at the, the reasonable conspicuousness of the webpage. And in that case, the Ninth Circuit reversed, uh, the district court for not, for focusing too much on the, uh, context of the transaction and not looking at the other factor. And in, in that case, because it was de novo review, the court considered the context of the transaction. And because in that case, these were users who were downloading an app in their, on their phone, uh, with unlimited access and unlimited in-app purchases. The court concluded that there could have, there was a real, a reasonable expectation that that relationship could have been governed by terms. And then it went into determining whether or not there was, um, the, the visual aspects of the, of the webpages was conspicuous or not. Um, so the, the fact that the court did not take that into consideration, um, is, I, I don't think it's, it's automatically reversible by that because this is a de novo review. I'd only add that, you know, even though this is an online dating site, our client did not, there was no subscription required. He did not submit his, uh, credit card. He did not pay for a subscription. Um, there was no money exchanged. What do you think that's relevant to, ongoing relationship? Con, uh, it's, well, it's relevant to context, context of the, context of the transaction that he would not have a reasonable expectation to look for, you know, uh, terms of service when he's not creating, uh, not creating a, he didn't apply for or pay for a subscription. There was no money exchanged. It's a free account. But he created an account, and unless you're really lucky, most people don't find their perfect match the first time they access a website, right? It takes time, potentially. So he did have an ongoing relationship with MillionaireMatch.com, right? I wouldn't say ongoing relationship. I don't think he thought it was an ongoing relationship. What did he think it was? He thought it was just a free account that he period, that he periodically, uh, uh, looked at, but eventually deleted. Isn't periodically ongoing? I'm sorry? Isn't periodically ongoing? It's not one time. Yeah, you're, you're right, Your Honor. It's not one time. But I think the fact that there was no subscription, no money exchanged, he did not create, um, he did not, um, provide his credit card information. He did not download the app. I think that make, that creates, that is evidence that shows that there wasn't a reasonable expectation that the relationship would be governed by contractual terms. And I think just like in Chabola, where the court balanced all the facts to determine whether or not there was, the context of the transaction was important, the court in the end, even though balancing all the facts, said that it was relatively neutral. It didn't help one or the other. So, and then focused on the lack of conspicuousness of the terms and the lack of manifestation of an, of assent to eventually come to, uh, to come to the conclusion that there was no meeting of the minds and affirm the trial court's order. Using the, the actual page as a predicate, what would you maintain, uh, should have been added and would have made it? Well, Your Honor, they should have delete, I mean, if, if they were to make this less distracting, they should not have bolded no sugar daddies or sugar babies. They should have the service agreement and privacy policy, they should have all capitalized it or colored it, something to make it stand out. The advisory or explanatory paragraph, it should have said by clicking the continue button, I agree to the terms of service because it didn't say, say that there was no unambiguous assent to the, to the service agreement. And that, those were, that's basically what the ruling in Godin was. And if I may, and I'm quoting from Godin, in Godin, the court held while, while Berman was straightforward, we clear up any remaining confusion. An advisal that simply states, I understand and agree to the terms and conditions, but fails to indicate to the user what action would constitute assent is not enough to invite an unambiguous manifestation of, of assent. So in this case, you have the terms, the, the service agreement and the textual notice were insufficient to give conspicuous notice. Counselor, did I hear you say a minute ago that your client did not create an account? No, he did not download the app and he did not create a subscription or pay for a subscription. But if he created an account, you don't think that's a relationship? Well, I think, I, I think it is a relationship. You're right. I, I think by, by the way, I think this is not a click wrap. This is a sign in wrap. Because in a click wrap, when you, you know, the, the terms and conditions are going to pop out and then you have to agree before you continue. This is a... That's what this was. You had to agree to, before you could continue. But the terms of service were not, did not pop out on the screen for you to review and click it. The terms and service were available, correct?  And it's not required for a click wrap agreement that the actual terms be on the same screen as the assent. That's correct. That's what's in the case law. It says in most instances that text is not going to be on the same screen. Correct. In the sign in wraps, you can create an account without actually reviewing the terms of service agreement. That's why this is a sign in wrap, not a click wrap. Right. But if you agree, then in a click wrap agreement, the actual terms don't have to be on the same screen as where you assent to the terms. That instance as well, the, the users may not be reading that, but agreeing to it. Correct. Okay. Your Honor, just to sum this up with the limited time I have left. Berman requires two elements. Conspicuous notice and unambiguous manifestation of assent. There was no conspicuous notice here. The text was underlined, normal text font as, you know, which was the same as other text on the page. And some of the text on the page was much larger. In it, finally, there was no unambiguous assent because the advisory notice nor the textual notice said by clicking the continue button, I agree to the service agreement. Thank you. Thank you, counsel. Rebuttal. Thank you, Your Honor. Just briefly, two points. One, since no sugar daddies and no sugar babies keeps coming back, the — there's a reason that that's there. There's a reason that it's boldface. And that's because the one — they don't want people signing up to be members for this service that are looking for something that the service isn't providing. Really? Then why have a millionairematch.com website? For people that have — Isn't that what you're looking for, sugar babies and sugar daddies? I think it's because — no, there are actually websites that cater to that. But what they are looking for here are people who have money and want to date other people with money that aren't looking to get rich by getting married to somebody with money. I think that's the intent. So they're trying to — this is — yes, they're saying don't sign up if that's what you're looking for, because that's not what we're — who we're looking for in terms of our members. All right. Thank you, counsel. One other thing. Briefly, you're over your time. I'm sorry. The assent issue is — if you look at Judge Bybee's dissent in the Chabela case, he actually quotes from Sellers, which is one of the leading California case. A click-wrap is an agreement where you click a box like this one, agree, and you have a hyperlink or you can have a pop-up, but you have — you can have a hyperlink that you just click and it pops up and it says here's what the agreement is. This is a classic click-wrap, which are, as far as I can tell, hardly ever overturned. Thank you, Your Honor. Counsel, thank you to both counsel for your helpful arguments. The case just argued is submitted for a decision by the court.
judges: RAWLINSON, KOH, Fitzwater